(112 App. Div. 225)

### PEOPLE v. BIGLIZEN.

(Supreme Court, Appellate Division, First Department.   April 6, 1906.)

1. RAPE—CORROBORATION OF FEMALE—INSTRUCTIONS—NECESSITY.
   Pen. Code, § 283, providing that no conviction can be had for rape on
   the testimony of the female unsupported by other evidence, does not re-
   quire the court, on a trial for rape, to instruct that a conviction cannot be
   had on the testimony of the female, unless corroborated.

2. SAME.
   Failure to charge that a conviction for rape cannot be had on the testi-
   mony of the female, unless corroborated, is not reversible error, where no
   request therefor is made, and it is not clear that the failure was prejudi-
   cial.

   [Ed. Note.—For cases in point, see vol. 42, Cent. Dig. Rape, § 89.]

3. SAME—EVIDENCE—SUFFICIENCY.
   On a trial for rape, evidence examined, and *held* to support a convic-
   tion.

   Ingraham, J., dissenting.

Appeal from Court of General Sessions, New York County.

Jacob Biglizen was convicted of rape, and he appeals.   Affirmed.

Argued before O'BRIEN, P. J., and PATTERSON, INGRAHAM,
LAUGHLIN, and CLARKE, JJ.

Lewis S. Chanler (Lorlys E. Rogers, on the brief), for appellant.
E. Crosby Kindleberger, for the People.

LAUGHLIN, J.   The indictment charges that the crime was com-
mitted on the 21st day of July, 1904.   The trial was had on the 24th
day of October thereafter.   The complaining witness, Jennie Herzog,
was only 9 years of age.   She lived with her parents and three brothers
and three sisters on the upper floor of a tenement building known as
Nos. 57 and 59 Pitt street, in the city of New York.   Two of the
brothers were aged 16 and 14 or 12 years, respectively, and the other
brother and all the sisters were younger than Jennie.   The defendant
was born in Russia, had been in this country 13 or 14 years, spoke
English, was 28 years of age, had boarded with the Herzogs the year
before 6 months and at this time 4 months, and was employed as a

furrier, earning from $8 to $10 per week "sometimes" "in the season." On the night of the 20th of July, Mrs. Herzog and some of her children slept on pillows and blankets on the roof. The defendant also slept on the roof, within 10 feet of them. The father slept below in the apartment. About 4 o'clock in the morning the mother arose and went below. Next to Jennie on one side slept her brother of six years, and on the other her sister of 4 years. On the preliminary examination of the court, Jennie said that she attended the Jewish Church every Sunday, attended public school every day, was in the fourth class, and able to read books. She was then permitted to be sworn, and testified that she awoke about 5 o'clock in the morning, after her mother had gone below, and found that the defendant had come over and got under the cover that was over her and was having intercourse with her, and it was then light; that defendant hurt her "very much" and she "cried very loud"; that defendant put the bed cover in her mouth, and held his left hand over her mouth, and held her little brother with his right, and told him not to tell his mother, and had given him money; that she did not "have a chance to cry out loud" until defendant left her and went downstairs, and then she cried out real loud and woke up her eldest brother, and sent her youngest brother down to tell her mother; that her mother came up and saw blood on her clothes—the clothes, a petticoat and nightdress, were introduced in evidence—and her father came up and took her downstairs and into defendant's room, and asked what he had done to her, and defendant said "he should pay money"; and that defendant was held, and her brother was sent to call a policeman. Her youngest brother was not accepted by the court as a witness. Her father testified that he and his eldest son slept down stairs; that in the morning, as he was about to go to his work, after his wife went upstairs "to see what the children were doing," she spoke or called him, and he ran upstairs, lifted Jennie's clothes, and saw "blood, blood, all over blood," and he took her down, and, pushing in the door of defendant's room and grabbing him by the throat, asked, "What did you do to my daughter Jennie?" to which defendant replied: "Keep quiet. Keep silent. I pay you for that"—and that then he sent for a policeman and had defendant arrested. On cross-examination, the father testified that when he first confronted defendant and asked, "How could you do these things to my child?" the defendant replied: "Well, I did it; but keep quiet. I'll pay for it." Jennie's mother testified that she left the roof about 4 o'clock, and returned about 5, and saw bloodstains on Jennie's clothes and summoned her husband. She further testified that defendant left the roof about 2 or 2:30, and was in his room when she went down; but this may be accounted for on the theory that he came in about 2 or 2:30, and, seeing him about, she thought he was getting up. She also testified to the interview between her husband and the defendant under circumstances practically the same as those narrated by her husband; but her version of the conversation is that the greeting to defendant was, "You murderer, you have ruined my daughter," and that his answer was: "Sh! I did it. I will pay you for it."

It is undisputed that a policeman was summoned by the eldest boy, and that on the arrival of the officer Jennie's father charged defendant

in the presence of the officer with having assaulted and ruined his child, and that, on being placed under arrest and charged by the officer with the crime of assaulting the child, defendant denied it. After the arrest of the defendant, and some time on the same day—the hour does not appear—Jennie was taken to the office of the Society for the Prevention of Cruelty to Children and examined by Dr. Brown. He was called by the prosecution, and testified from memory as to what he found, although he admitted having made a memorandum concerning the examination, and that during six or seven years he had examined the private parts of over 500 children for the Society. He said that the parts had been lacerated by the penetration of a blunt instrument, which ruptured the hymen, and that the conditions he found indicated that the penetration had occurred about two weeks before, causing acute inflammation; and yet he testified that "the mucous membrane of the internal genitals was rubbed off and bleeding." His testimony was not consistent. The jury were not obliged to believe that bleeding would continue two weeks. Other evidence in the case, relating to the weather and lack of cleanliness, tends to account for the conditions narrated by the physician as having been found by him and on which he expressed the opinion that the penetration took place two weeks before, assuming his testimony in that regard to be accurate. The jury, however, might have found that he was mistaken in some of his facts or that his opinion was not well founded.

The defendant testified that he came in that night at 2 o'clock and took pillows, a sheet, and a quilt, and slept on the roof until 5, when he arose and went to his room and lay down again and fell asleep; that he was awakened by people running and holloing, and went to the door to see what was the matter, just as "they opened it on me"; that Jennie's father said, "What did you do to my girl?" to which he replied, "I didn't done nothing to the kind"; and then he testified that the father said nothing to him, but the mother asked, "What did you done to my child?" and that he made answer, "I didn't done nothing," but that he didn't know what she meant, and had to say something. He testified on his direct examination that a week or ten days before he was arrested he saw Jennie's brother, 12 years old, having intercourse with her twice, and admitted on cross-examination that he knew it was not right, but that he neither remonstrated with the children nor informed their parents; that he considered it none of his business, and never spoke of it, even to his lawyer or anybody, until upon the witness stand, and then says the reason he did not tell it when charged by the parents and when before the police court was that he forgot it. Three witnesses testified that defendant's reputation for "peace and quietness and orderliness" was good.

The court, in instructing the jury, spoke of the blood found on the child as being fresh; and counsel for defendant excepted. The court thereupon assured the jury that any expression of opinion by the court upon the facts was inadvertent and should be disregarded, and that they were the exclusive judges of the facts. No other exception to the charge was taken.

If the jury believed the testimony of Jennie, the defendant committed the crime of which he has been found guilty. It is claimed that her

testimony is utterly improbable. Stress is laid on the fact that it was light or just getting light, that she says she made an outcry, and that there were many others on the roof, none of whom were called as witnesses. The defendant says that he was sleeping only 10 feet distant. She says that he got under the cover over her. Such a change of position might not be noticed at that hour, even if there were others on the roof; for they would likely be asleep. However, they would regard him as a member of the Herzog family, and would not be apt to pay attention to his movements. Jennie's testimony is susceptible of the construction that she did not and could not cry out until after the defendant went away. Furthermore, the jury were justified in finding that there was no one on the roof at the time, with the exception of her brothers and sisters, all younger than herself. Jennie testified that there were 14 people sleeping on the roof, consisting of her 3 brothers and 2 of her sisters, herself, defendant, another woman from the same floor and her three small children, and a woman and her little girl and husband from the fourth floor. Earlier in her testimony, she said she went up on the roof to sleep with her mother, eldest brother, and two sisters. Her father places the eldest brother with him in the apartment. The defendant, after saying the he could not tell how many people were "laying on the roof" when he left, "about 20," testified as follows: "There was nobody else on that roof besides the Herzog children and Mrs. Herzog; only me and Mrs. Herzog and the children." This being the testimony of the defendant, and the last given on the point, he cannot complain if the jury accepted it.

The learned counsel for the appellant urges a reversal on account of the omission of the court to instruct the jury that they could not convict on the testimony of the complaining witness, unless corroborated. The defendant was represented by counsel, and no suggestion was made that the jury might disbelieve the corroborating witnesses and at the same time believe the complaining witness, which is the only thing on which there was necessity for such instructions. The statute does not require the court to instruct the jury on this point. It merely declares, as a rule of law, that "no conviction can be had * * * for rape * * * upon the testimony of the female * * * unsupported by other evidence." Pen. Code, § 283. While it would be well for the court in all such cases to fully instruct the jury on this point, yet failure to do so should not be considered reversible error, when no request for such instruction is presented and it is not clear that such failure was prejudicial. It is scarcely conceivable that the jury would have convicted the defendant on the little girl's testimony, if they disbelieved the corroborating testimony of her parents. Any reasonable man of average intelligence would, I think, accept the testimony of the girl and her parents, or reject it all. The corroboration was complete. The parents saw the evidences of the recent assault by some one. The child accused the defendant. He was there and had the opportunity, and when confronted he admitted it.

Such a crime committed on a child is unnatural and most revolting under any circumstances. One hesitates to believe that an industrious young man, while apparently sober, could be guilty of such a horrible crime. But, when we recall the testimony of this defendant that he dis-

covered improper relations between this little girl and her older brother a week or ten days before, and watched with morbid curiosity to see them repeat it, and failed to inform the parents, with whom he was living and had lived for nearly a year and was on terms of friendship, it is not so difficult to believe that he would himself endeavor to have intercourse with the little girl. This is a case depending on the credibility of witnesses, and where the truth was to be detected more from the appearances of the witnesses and their manner of testifying than from the words they uttered. It was, therefore, peculiarly within the province of the jury, and their verdict should not be disturbed.

It follows that the conviction should be affirmed.

O'BRIEN, P. J., and PATTERSON and CLARKE, JJ., concur.

INGRAHAM, J. In view of the testimony of the physician called for the prosecution, together with the unsatisfactory character of the testimony of the principal witness for the prosecution, and the fact that her testimony was uncorroborated, I do not think this judgment should be allowed to stand. The jury were not instructed that the testimony of the child must be corroborated before they were justified in convicting the defendant, and, while there seems to have been no request for such instruction, in view of the character of this evidence, taken in connection with the failure of the court to instruct the jury as to the necessity of such corroboration, justice requires that there should be a new trial.

I therefore dissent.